**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ARENA GROUP HOLDINGS, INC, | Case No. 1:25-cv-09920 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| INVESTSTRONG, LLC and JOYCE GIRAUD, | |
| Defendants. | |

Plaintiff The Arena Group Holdings, Inc. ("Arena" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendants InvestStrong, LLC ("InvestStrong") and Joyce Giraud ("Giraud", together with InvestStrong, "Defendants"), and alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.     This action arises from Defendants' misappropriation of Arena's proprietary and trade secret customer data and the goodwill of the ShopHQ brand – assets Arena owns. A former IV Media, LLC ("IV Media") employee mistakenly, without authority, and under pressure transmitted detailed customer data to Defendants. When return of the data was sought, Defendants refused. Instead, they have kept the data, used it for their own purposes, and launched a campaign to steal the very customers whose identities and purchasing histories they improperly obtained without authority.

2.     After misappropriating Arena's customer lists, Defendants immediately began using them to solicit Arena's customers through calls, texts, and emails that would have been impossible without Arena's confidential data. Defendants then went further: they attempted to recreate the ShopHQ experience for their own benefit by partnering with a ShopHQ host, staging

giveaways modeled on ShopHQ promotions, and using ShopHQ-branded videos across their online platforms. These coordinated efforts demonstrate that Defendants were not merely using Arena's proprietary customer lists, they were also unjustly deriving commercial value from ShopHQ's brand that is now owned by Arena.

3.      By retaining and exploiting Arena's proprietary data, refusing to return it despite multiple demands, and using it to solicit and convert Arena's customers, Defendants have violated federal and state law. Arena brings this action to recover its damages and to obtain injunctive relief preventing Defendants from continuing to use, disclose, or profit from Arena's trade secrets and assets.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Arena is a Delaware Corporation with its principal place of business at 200 Vesey St, 24th Floor, New York, New York 10281.

5.      Upon information and belief, Defendant InvestStrong is a limited liability company organized and operating under the laws of the State of Delaware, with its principal place of business located in Studio City, California. Upon information and belief, InvestStrong's members include Giraud and Michael Ohoven who are citizens of California.

6.      Defendant Giraud is an individual, who, upon information and belief, is domiciled in California.

7.      This Court has personal jurisdiction over Defendants because they have transacted, done, and solicited business in this District.

8.      In addition, personal jurisdiction is proper under New York C.P.L.R. § 302(a)(1) because Defendants, directly and through agents, have transacted business within New York and this action arises from those transactions. Defendants have purposefully directed their commercial

activities toward New York by soliciting and selling Joyce Giraud-branded products to New York customers through online platforms and by using Arena's customer lists that identifies existing New York customers. The injury to Arena from Defendants' conduct was and continues to be felt in this District.

9.      This Court has subject-matter jurisdiction over this action pursuant to 28. U.S.C. § 1331.

10.     Venue is further proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL BACKGROUND

### A.  Arena Purchases ShopHQ Assets

11.     ShopHQ is the brand name formerly associated with the American home shopping television network and e-commerce retailer that operated from 1991 to 2025 under various trade names, specializing in live televised sales of jewelry, watches, fashion, beauty products, electronics, and home goods. Until early April 2025, the ShopHQ 24/7 live TV shopping channel broadcasted live hosts demonstrating products in real-time, and provided American consumers the ability and convenience of making immediate purchases via phone, the ShopHQ website, or ShopHQ app.

12.     The ShopHQ brand and related assets were purchased by IV Media through a bankruptcy sale in August 2023. ShopHQ was then owned and operated by IV Media until the Company closed its doors and began winding down in the first half of 2025. As of April 2025, the company's headquarters in Eden Prairie, Minnesota were shutdown, nearly all of the Company's

employees were laid off, operations were discontinued, and by July 2025 the ShopHQ website was turned off for several months before it was relaunched by Arena in September 2025.

13.     On or about October 7, 2025, Plaintiff entered into an Asset Purchase Agreement with IV Media pursuant to which Arena purchased all of the intellectual property formerly associated with and owned by ShopHQ, including but not limited to customer identification, contact information and purchase data, customer subscription program data, Google analytics data related to shophq.com and mobile apps, dozens of registered domains, and over 30 unique registered trademarks. Arena did not assume IV Media's liabilities in the transaction, other than those limited liabilities arising from ownership of assets post-closing.

14.     With this newly-acquired intellectual property, Arena is in the process of developing a modernized digital platform that will allow ShopHQ customers to discover products and interact with hosts and talent, on a more streamlined, on-demand retail environment. Under Arena's direction, the ShopHQ-branded website is now operational again.

15.     ShopHQ's loyal customer base and the customer analytics developed and maintained by IV Media and now owned and expanded on by Arena, are essential assets that will drive Arena's revamp and growth of the ShopHQ brand.

**B. Defendants' Relationship with ShopHQ**

16.     Defendant InvestStrong is, upon information and belief, the exclusive provider and distributor of Joyce Giraud Beauty ("JGB") products, which includes beauty elixirs, supplement "gummies", hair masks, shampoos and conditioners. Upon further information and belief, Giraud is an actress, model, and beauty pageant winner, who appeared on season four of Bravo's Real Housewives of Beverly Hills. Additionally, upon information and belief, Giraud is an entrepreneur who founded JGB and serves as the spokesperson of the brand.

17.     For several years, JGB products were sold on the ShopHQ platform, which served as the exclusive television network for JGB products, allowing JGB able to develop a significant customer base. Through this commercial relationship, Defendants benefited from ShopHQ's marketing, promotional infrastructure, and customer outreach, and gained access to extensive sales reach generated through ShopHQ's televised and online retail channels.

18.     During this period, Defendants knew that ShopHQ (including IV Media and Arena) maintained confidential customer data, including customer lists, marketing techniques, business strategies, sales information (by customer and product type) and that such information was treated as confidential and protected from disclosure. To that end, Defendants' agreement with IV Media expressly identified customer lists and related commercial data as confidential, non-public assets that could not be used or retained outside the scope defined by the contract.

19.     ShopHQ, and now Arena, maintained the confidentiality of its customer data base by restricting internal access, password-protecting stored data, and requiring employees and vendors with access to such information to comply with confidentiality obligations.

20.     ShopHQ invested significant time, effort, and resources attracting and retaining its customers, obtaining, and tracking customer contact information, and analyzing customer purchase and sales information to develop its customer data. This database was the result of years of work, with ShopHQ hiring and training an entire staff of employees to create and keep the data up to date. This information simply could not be recreated by InvestStrong or Giraud.

21.     Accordingly, Defendants were aware that any customer information related to ShopHQ customers, including data pertaining to customers of JGB products, constituted confidential and proprietary information belongingly exclusively to ShopHQ, and following the

asset sale, Arena. In fact, Defendants were contractually obligated not to sell JGB products to customers within such lists.

**C. Inadvertent Transmission of Arena's Proprietary Customer Data**

22.    Arena recently learned that Defendants have wrongfully sought and obtained proprietary, confidential, and trade secret, Joyce Giraud customer data (the "Proprietary Customer Data"), and are improperly using such Proprietary Customer Data to contact such customers and sell JGB products directly to them.

23.    During the IV Media wind down, when the workforce had been reduced from thousands of employees to a small group of remaining staff, a former IV Media employee took a phone call with Giraud and her husband Michael Ohoven ("Ohoven"), who, upon information and belief, is a co-owner of InvestStrong with Giraud. Giraud and Ohoven pressured the former IV Media employee to share customer contact information and sales information with InvestStrong so that Giraud could personally communicate with her top customers. Defendants knew they were not entitled to this information and that it is proprietary and confidential.

24.    In the midst of operational challenges during the IV Media wind down, the former employee, uncertain how to respond, consulted a few remaining colleagues, none of whom had authority to make decisions regarding the Proprietary Customer Data. Influenced by the insistence of Giraud, a well-known celebrity, and Ohoven, coupled with this informal discussion, and without consulting any executive with actual decision-making authority, the employee accepted misguided advice from her colleagues to transfer the trade secret data to the Defendants. No person with authority approved, authorized, or intended this transmission.

25.    Thereafter, the former IV Media employee, mistakenly and without authority, emailed Ohoven, the report containing the Proprietary Customer Data, which included a list of

ShopHQ customers who had purchased JGB products since 2023, including those customers' telephone numbers, mailing addresses, email addresses, the volume and type of products purchased, the total dollar spent on JGB products, and other proprietary and confidential analytics.

26.     The former IV Media employee who mistakenly provided the Proprietary Customer Data to InvestStrong did not herself have access to this trade secret information. She had to ask another colleague, one of the few individuals still able to operate a specialized internal software system maintained by the company's IT department, to run a query and extract the data.

27.     Moreover, these former IV Media employees had confidentiality and non-disclosure obligations to IV Media and ShopHQ (which were violated), did not seek authority from IV Media management to share the trade secret information, and understood the commercial value of the data. Sharing the data with Defendants was a lapse of judgment and a mistake driven and compounded by the pressure exerted from Giraud and Ohoven.

28.     Upon receiving the file, Ohoven responded by thanking the former IV Media employee noting "this is really helpful" and induced her to share additional data of "top" ShopHQ purchasers of JGB products. He represented that Giraud would personally call those "top buyers" using the Propriety Customer Data the former IV Media employee had improperly and mistakenly provided. Further, upon information and belief, Ohoven transferred the Proprietary Customer Data to Giraud without authority and in violation of InvestStrong's confidentiality obligations.

29.     Ohoven's response reflected that the Defendants understood that the file contained proprietary and trade secret information, recognized its commercial value, and appreciated that it provided access to Arena's highest-value customers.

30.    Days after the initial communication and inadvertent transmission, Ohoven emailed the former IV Media employee again and, upon information and belief, prompted her to send additional customer data, also without authorization, which she did.

**D.  Defendants' Use of Proprietary Customer Data**

31.    Publicly-available information confirms that Defendant Giraud did exactly what InvestStrong said she would: she personally contacted ShopHQ customers and/or directed InvestStrong representatives to contact ShopHQ Customers, which would have been impossible had Defendants not improperly obtained the Proprietary Customer Data. Upon information and belief, many of the customers Giraud contacted included ShopHQ's highest-spending purchasers of JGB products.

32.    At least four ShopHQ customers have publicly posted on Facebook and/or on www.joycegiraud.com describing the phone calls and text messages they received from Giraud marketing products and providing information about how to make purchases.

33.    As one example, on May 7, 2025, ShopHQ customer Kathy B. posted on a ShopHQ Fans Facebook group that she received a phone call from Giraud "calling to make sure that I had not been caught off guard without supplements or anything else from her line. She told me how to order from her website until she in so many words "finds a new home." ShopHQ Customer Lynn N. responded to the post, commenting that she also got a call from Giraud and "she was so nice." The name Kathy B. and her contact information appear in the Proprietary Customer Data sent to Ohoven. Ms. B's remarks about receiving a personal call from Giraud and Giraud's statements that she had a "long list of customers to call" underscores that Defendants were likely using the Proprietary Customer Data to make targeted contact with Arena's customers.

34.     As another example, ShopHQ customer "Rose M." posted a review on joycegiraurd.com on or about July 9, 2025, sharing "I used to take the capsules & stopped because no longer have the shop HQ [sic] channel; I use to get on Dish on our tv,…. I received a text from [Giraud's] company & just in time when I desperately needed [Giraud] most." One "Rose M.," also appears on the customer list transmitted to Ohoven, and the public review stating that she received a text message from JGB supports the claim that Defendants used the Proprietary Customer Data despite knowing that it is confidential and that they did not have authority to do so. Defendants' solicitation and the resulting sales are further evidenced by Rose M's review, in which she confirms that she purchased three-bottles because of Defendants' outreach.



https://www.joycegiraud.com/pages/reviews

35.     Another customer "Denise J" posted a review on the JGB website on or about July 17, 2025, that she has "been using [Giraud's] hair supplements for several years and was thrilled that [Giraud] reached out to customers from SHOPHQ."



https://www.joycegiraud.com/pages/reviews

36.    On or about July 21, 2025, another ShopHQ Customer Diedra N. posted on the JGB website that "I just happened to got [sic] an e-mail with [JGB's] product information so I ordered the 3-bottle special."



https://www.joycegiraud.com/pages/reviews

37.    These public statements collectively demonstrate that Defendants improperly used the Proprietary Customer Data to systematically solicit ShopHQ's customers. The timing of the

outreach, the nature of the communications, the identification of customers previously known only to ShopHQ, and listed in the Proprietary Customer Data, all confirm that Defendants relied on the misappropriated data to generate sales and redirect customer relationships to themselves.

38.    Defendants' outreach efforts further demonstrate their intent to exploit not only Arena's Proprietary Customer Data, but also ShopHQ's brand value, goodwill and customer relationships built through the ShopHQ platform.

**E.  Defendants' Attempts to Recreate the ShopHQ Experience**

39.    In January 2025, before ShopHQ ceased operations, ShopHQ produced a promotional giveaway hosted on Instagram featuring JGB products promoted by ShopHQ's contracted guest host Janae Moore appearing with the products on a ShopHQ set. This content was directed at ShopHQ viewers and customers, including many of the same individuals reflected in the Proprietary Customer Data misappropriated by the Defendants.



https://www.instagram.com/p/DE8OOfYRwWS/?utm_source=ig_web_button_share_sheet

40.    In September 2025, after Defendants had obtained Arena's Proprietary Customer Data, Giraud partnered with the same ShopHQ host, Janae Moore, to promote a similar giveaway

11

on the same social media platform, Instagram. The structure, presentation, and targeting of this September promotion closely mirrored the original ShopHQ-hosted January campaign. The replication of ShopHQ's sales format, using recognized ShopHQ hosts, strongly indicates that Defendants were attempting to imitate the trusted ShopHQ sales environment to reengage and capture ShopHQ customers.



https://www.instagram.com/reel/DOyfDtGjnCi/?utm_source=ig_web_button_share_sheet

41.     Additionally, Defendants have displayed numerous product images on their website which were originally created, produced, and owned by ShopHQ (and now Arena). These images, which are professionally staged, were developed at ShopHQ's expense and form part of the assets which Arena purchased. Defendants' continued use of these images, without authorization or compensation, trades on the shopping environment associated with the ShopHQ brand.

  

https://www.joycegiraud.com/

42.     By incorporating ShopHQ visuals and hosts into their marketing, Defendants sought to further leverage the familiarity and credibility associated with ShopHQ to attract and convert former ShopHQ customers during their solicitation using the Proprietary Customer Data.

43.     Taken together, the September giveaway, partnering with a ShopHQ host, and using ShopHQ-produced images demonstrate that Defendants were not merely using Arena's Proprietary Customer Data – they were leveraging Arena's proprietary assets, customer relationships, and the ShopHQ brand to generate commercial benefits for themselves without any right to do so and at Arena's expense.

**F.  Defendants Wrongfully Exploit the ShopHQ Trademarks**

44.     In addition to misappropriating Arena's Proprietary Customer Data and in furtherance of leveraging the ShopHQ brand, Defendants are also using the ShopHQ registered trademarked logos without authorization. Three ShopHQ logos are registered with the United States Patent and Trademark Office, and at least one is currently being used by Defendants without Arena's authorization. The trademarks are currently owned by Arena.

45.     Defendants prominently display the ShopHQ logos in video content published on their website and on their YouTube channel. These videos include the ShopHQ logo embedded in

the frame, on-screen, and otherwise displayed as part of the presentation, despite Defendants having no authorization to use the marks.

46.    The videos featuring the ShopHQ logos were used to promote and advertise JGB products by depicting footage originally produced for ShopHQ's televised shopping broadcasts. Defendants repurposed this content to market JGB products directly to consumers, without authority. There can be no mistake that JGB reproduced the videos to solicit sales and attract ShopHQ's customers.

47.    In each video, the ShopHQ logo remains visible for approximately 25 seconds, and the videos repeatedly refer to JGB products as the 'No. 1' products on the ShopHQ network, reinforcing a continued association that does not exist.

48.    Arena has not authorized, licensed, or otherwise permitted Defendants to use the ShopHQ logos; Defendants nevertheless exploit the ShopHQ trademark(s) in connection with JGB's promotional activities.

49.    Defendants' unauthorized use of the ShopHQ logos is likely to cause, and upon information and belief, has caused consumer confusion by suggesting that Defendants' promotional videos and sales efforts are affiliated with, endorsed by, or sponsored by ShopHQ or Arena. Defendants' reliance on ShopHQ-branded footage and logos creates the false impression that their marketing efforts were a continuation of ShopHQ's televised shopping environment, which they are not.



https://www.joycegiraud.com/



https://youtu.be/slC-020mHes?si=MvHFDHGZvYLRxcIZ



https://www.youtube.com/watch?v=TLuqqOmLC-0

50.     Defendants' unauthorized use of the ShopHQ's trademarked logos is part of a broader effort by Defendants to replicate the ShopHQ experience and capitalize on the goodwill associated with the brand, including leveraging ShopHQ hosts and video content – all of which culminated in their acquisition and improper use of Arena's Proprietary Customer Data.

## G. Defendants Refuse to Cease and Desist Using Arena's Trade Secrets and Intellectual Property

51.     During the ShopHQ wind down and the transition of assets and vendors, IV Media learned for the first time that the Proprietary Customer Data had been inadvertently (and at the behest of the Defendants) transmitted to Defendants.

52.     IV Media, as the outgoing owner of the ShopHQ assets, demanded that Defendants cease all use of the information and return it.

53.     Specifically, on September 3, 2025, counsel for IV Media emailed counsel for InvestStrong and demanded that InvestStrong immediately cease and desist from using the

Proprietary Customer Data, return all physical materials containing such information, permanently delete all electronic copies of such information, and provide a written certification of the same by September 10, 2025.

54.     On September 9, 2025, counsel for InvestStrong responded and rejected IV Media's demand, asserting baseless positions, including that the former employee had "voluntarily," with authority and without condition, provided the Proprietary Customer Data, and that ShopHQ was estopped from bringing any claim or seeking relief relating to that data.

55.     These assertions were unfounded— Defendants do not have knowledge of which IV Media employees have authority to share trade secret information, and which do not. The Proprietary Customer Data was disclosed solely because Defendants sought the information from a former employee who lacked authority to share it, and who ultimately shared it by mistake, a fact InvestStrong omitted. Therefore, InvestStrong's uninformed position that estoppel barred any claim was also incorrect: an inadvertent, unintentional, and unauthorized transmission cannot confer ownership, consent, or any legal entitlement to retain Proprietary Customer Data.

56.     In that vein, IV Media responded on September 16, 2025, explaining that the former IV Media employee who shared the Proprietary Customer Data had absolutely no authority to do so and that the executives with such authority were never consulted. IV Media reiterated that Defendants were therefore in possession of Proprietary Customer Data to which they had no rights, and again directed Defendants to return, delete, and certify deletion of such data.

57.     Despite the correction to any purported misunderstanding by Defendants about their basis for obtaining this information and in the face of repeated demands that they return and stop using Arena's Proprietary Customer Data, Defendants continue to refuse to do so. Instead,

upon information and belief, Defendants continue to retain, access, and use Aena's Proprietary Customer Data to Arena's detriment.

## CAUSES OF ACTION

### Count I
### Misappropriation of Trade Secrets under 18 U.S.C. 1836 *et. seq.*
### (Against InvestStrong and Giraud)

58.     Arena realleges and incorporates all preceding paragraphs.

59.     Arena owns protectable trade secrets within the meaning of 18 U.S.C. § 1839(3), including confidential customer lists containing non-public information including customer identities, telephone numbers, mailing addresses, email addresses, the volume and type of products purchased by each customer, the total dollar spent on JGB products, and other proprietary information that was secret, valuable in the industry, and had not been disclosed to anyone outside of ShopHQ.

60.     The trade secrets contained in the Proprietary Customer Data derive independent economic value from not being generally known to, and not readily ascertainably by, others who could obtain economic value from their disclosure or use. Arena takes reasonable measures to maintain the secrecy of this information, including restricting internal access, requiring confidentiality agreements, and implementing password-protected storage.

61.     Defendants sought Arena's trade secrets, and thereafter acquired them by mistake, and thereafter, accessed, viewed, retained, and used that information without Arena's authorization or consent.

62.     Upon information and belief, Defendants knew or had reason to know that the Arena Trade Secrets were confidential and proprietary because their contract with IV Media

expressly identified such customer information as confidential and protected from disclosure or use.

63.     Upon information and belief, Defendants used the trade secrets to solicit Arena's customers, two at the minimum, including by making phone calls, sending emails and texts, and engaging in direct sales to customers identified on the misappropriated lists.

64.     Defendants' conduct constitutes misappropriation under 18 U.S.C. § 1839(5)(B), as Defendants acquired the trade secrets knowing or having reason to know that the information was a trade secret and that their knowledge of it was obtained by accident or mistake, and thereafter used the trade secrets without authorization.

65.     As a direct result of Defendants' misappropriation, Arena had suffered, and will continue to suffer, damages in an amount to be proven at trial. In addition, Arena is entitled to injunctive relief restraining Defendants from any further use, disclosure, or possession of Arena's trade secrets.

66.     As a direct result of Defendants' misappropriation, Arena has suffered and will continue to suffer damages in an amount to be proven at trial and, in addition, Arena is entitled to injunctive relief against the Defendants to enjoin them from their ongoing use of trade secrets and force their return of the Proprietary Customer Data.

## Count II
## Conversion
### (Against InvestStrong and Giraud)

67.     Arena realleges and incorporates all preceding paragraphs.

68.     Arena has a superior and exclusive right of ownership, possession, and control over its confidential information and Proprietary Customer Data.

69.     Defendants obtained access to such information solely as a result of an inadvertent transmission and were never authorized to retain, possess, or use the data for any purpose.

70.     Defendants were notified of the inadvertent disclosure of Arena's confidential and proprietary data.

71.     Defendants refused demands to return the Proprietary Customer Data and, instead, wrongfully exercised dominion and control over the information in a manner wholly inconsistent with Arena's ownership rights.

72.     Defendants' continued retention, possession, and use of Arena's Proprietary Customer Data and confidential information, after notice and demand, constitute conversion under New York law.

73.     As a direct result of Defendants' conversion, Arena has suffered and will continue to suffer harm and is entitled to damages and all other appropriate relief to be determined at trial.

**Count III**
**Trademark Infringement under 15 U.S.C. §§ 1114 and 1125**
**(Against InvestStrong and Giraud)**

74.     Arena realleges and incorporates all preceding paragraphs.

75.     Arena is the lawful owner of the registered ShopHQ trademarks, including the logo.

76.     The ShopHQ logos are valid, continuously used in commerce in connection with its services, and widely known throughout the United States.

77.     ShopHQ has spent significant resources advertising and promoting the trademarks over decades of national televised operations. Arena now owns the ShopHQ logos and has invested further additional resources into preserving, maintaining, and redeveloping the ShopHQ brand, including its digital assets.

78.     Defendants, without Arena's authorization, used and continue to use the ShopHQ logos in commerce by publicly displaying ShopHQ-branded videos that included the ShopHQ logo on the Defendants' website and YouTube channel. Defendants used this content to advertise, promote, and sell JGB products.

79.     Defendants' unauthorized use of the ShopHQ logos is, upon information and belief, intended to divert consumers to JGB's website to solicit sales.

80.     Defendants' use of the ShopHQ logos is likely to cause consumer confusion by suggesting that their marketing efforts are affiliated with, endorsed by, or sponsored by ShopHQ or Arena.

81.     Defendants conduct constitutes trademark infringement in violation of 15 U.S.C. §§ 1114 and 1125.

82.     Upon information and belief, the conduct of Defendants has been and is willful and deliberate.

83.     Defendants conduct is causing and, unless enjoined and restrained by this Court, will continue to cause, Arena great and irreparable injury that cannot fully be compensated in money. Arena has no adequate remedy at law.

**Count IV**
**Unjust Enrichment**
**(Against InvestStrong and Giraud)**

84.     Arena realleges and incorporates all preceding paragraphs.

85.     Defendants received and retained Proprietary Customer Data which was developed and maintained at Arena's expense and for Arena's commercial benefit.

86.     Defendants knowingly used and exploited the Proprietary Customer Data to generate, or attempt to generate, a commercial benefit for themselves by soliciting and making sales to customers identified therein.

87.     Defendants were never authorized to retain, use, or benefit from the Proprietary Customer Data and did not compensate Arena for the value of this information.

88.     Defendants' retention and use of the Proprietary Customer Data conferred a direct, measurable, and unjust benefit upon Defendants at Arena's expense.

89.     Defendants further benefited by leveraging the ShopHQ brand value, images, and goodwill that is owned by Arena, thereby obtaining additional commercial advantage at Arena's expense.

90.     Under principles of equity and good conscience, Defendants should not be permitted to retain that benefit without compensating Arena.

91.     Arena is entitled to restitution and judgment against Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Arena respectfully requests that the Court:

a.      Award damages in favor of Arena in an amount to be determined at trial, including all compensatory, actual, consequential, statutory, and punitive damages under the law;

b.      Order Defendants to disgorge and pay over all unjust profits, revenues, or other benefits derived from their misappropriation, conversion, or other wrongful conduct;

c.      Award Arena its reasonable attorneys' fees, expert fees, and litigation costs as permitted by 18 U.S.C. § 1836(b)(3)(D), 15 U.S.C. § 1117(a), and applicable New York law;

d.    Preliminarily and permanently enjoin Defendants from directly or indirectly using, disclosing, storing, or maintaining Arena's confidential or trade-secret information, including the customer lists;

e.    Order Defendants to return the Proprietary Customer Data to Arena;

f.    Preliminarily and permanently enjoin Defendants from using the ShopHQ Trademarks;

g.    Award pre- and post-judgment interest as permitted by law; and

h.    Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Arena hereby demands a trial by jury on all issues so triable.

Dated: November 26, 2025
New York, New York

Respectfully submitted,

HARRIS ST. LAURENT & WECHSLER LLP

By: */s/ Yonaton Aronoff*
Yonaton Aronoff, Esq.
Megan Dubatowka, Esq.
40 Wall Street, 53rd Floor
New York, New York 10005
yaronoff@hs-law.com
mdubatowka@hs-law.com
(212) 397-3370

*Attorneys for Plaintiff The Arena Group Holdings, Inc.*

23